IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| WILDCAT INTELLECTUAL | § | |
|---|---|---|
| PROPERTY HOLDINGS, LLC | § | |
| | § | |
| Plaintiff | § | |
| vs. | § | CASE NO. 2:11-CV-0305-JRG |
| | § | |
| ELECTRONIC ARTS, INC. *et al.* | § | |
| | § | |
| Defendants | § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is the parties' claim construction briefing. (Dkt. Nos. 165, 183, 187.) The Court held a claim construction hearing on December 20, 2012. The Order will first briefly address the patent-in-suit and then turn to the merits of the claim construction issues.

**I. BACKGROUND AND THE PATENT-IN-SUIT**

Plaintiff Wildcat Intellectual Property Holdings, Inc. ("Plaintiff") brings this action against defendants Electronic Arts Inc., Konami Digital Entertainment, Inc., Panini America, Inc., The Pokemon Company International, Inc., Sony Computer Entertainment America LLC, Sony Online Entertainment LLC, The Topps Company, Inc., and Wizards of the Coast LLC (collectively, "Defendants") alleging infringement of U.S. Pat. No. 6,200,216 (the "'216 Patent"). By December 20, 2012, the day of the claim construction hearing, most Defendants had reached a settlement with Plaintiff and only Konami Digital Entertainment, Inc., ("Konami") remained in the case. Two independent claims, claims 1 and 21, are asserted. The asserted dependent claims are claims 9, 10, 29, 30 and 36. Though seven groupings of claim disputes

1

were initially briefed, by the time of the claim construction hearing only two claim disputes remained as described below.

The '261 Patent entitled, ELECTRONIC TRADING CARD, relates to an electronic hardware and software architecture for an electronic trading card system. Abstract. The Background of the Invention describes prior art paper trading cards which have been long used in collecting and trading sports cards, cartoon characters, fantasy figures, and used in role playing games, and the like. 1:10-17. The '261 Patent provides an electronic system of carrying out the paper trading card concepts in consumer digital media. 3:33-40. A disassociated computer program is utilized to support and enhance electronic collecting, trading, game playing and creating digital electronic trading cards. 4:43-50. Scarcity and authenticity is described as being an important feature of trading cards. 5:8-11. The format of the electronic trading cards allows for the dissemination of the electronic trading cards to include scarcity and authenticity control. *Id.* The two asserted independent claims are representative of the claimed concepts:

> 1. A system for the implementation of a trading card metaphor, comprising:
> a disassociated computer program, consisting of a plurality of electronic trading cards (ETCs), each ETC corresponding to a disassociated computer code segment and having an electronic format that supports card scarcity and card authenticity.

> 21. A method for the implementing a trading card metaphor, comprising the steps of:
> a[1] dissociating a computer program, consisting of a plurality of electronic trading cards (ETCs), each ETC corresponding to a disassociated computer code segment and having an electronic format that supports card scarcity and card authenticity.

## II. LEGAL PRINCIPLES

### A. Claim Construction Principles

"A claim in a patent provides the metes and bounds of the right which the patent confers

---
[1] The parties do not dispute that in claim 21 the "a" prior to "dissociating a computer program" was a Patent Office printing error.

on the patentee to exclude others from making, using or selling the protected invention." *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999). Claim construction is an issue of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

To ascertain the meaning of claims, the court looks to three primary sources: the claims, the specification, and the prosecution history. *Markman*, 52 F.3d at 979. The specification must contain a written description of the invention that enables one of ordinary skill in the art to make and use the invention. *Id.* A patent's claims must be read in view of the specification, of which they are a part. *Id.* For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims. *Id.* "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims." *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

Nonetheless, it is the function of the claims, not the specification, to set forth the limits of the patentee's invention. Otherwise, there would be no need for claims. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc). The patentee is free to be his own lexicographer, but any special definition given to a word must be clearly set forth in the specification. *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1388 (Fed. Cir. 1992). Although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than the embodiments. *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

This court's claim construction decision must be informed by the Federal Circuit's decision in *Phillips v. AWH Corporation*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). In *Phillips*,

the court set forth several guideposts that courts should follow when construing claims. In particular, the court reiterated that "the claims of a patent define the invention to which the patentee is entitled the right to exclude." 415 F.3d at 1312 (emphasis added) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To that end, the words used in a claim are generally given their ordinary and customary meaning. *Id*. The ordinary and customary meaning of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id*. at 1313. This principle of patent law flows naturally from the recognition that inventors are usually persons who are skilled in the field of the invention and that patents are addressed to and intended to be read by others skilled in the particular art. *Id*.

Despite the importance of claim terms, *Phillips* made clear that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id*. Although the claims themselves may provide guidance as to the meaning of particular terms, those terms are part of "a fully integrated written instrument." *Id*. at 1315 (quoting *Markman*, 52 F.3d at 978). Thus, the *Phillips* court emphasized the specification as being the primary basis for construing the claims. *Id*. at 1314-17. As the Supreme Court stated long ago, "in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims." *Bates v. Coe*, 98 U.S. 31, 38 (1878). In addressing the role of the specification, the *Phillips* court quoted with approval its earlier observations from *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir.

1998):

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

*Phillips*, 415 F.3d at 1316. Consequently, *Phillips* emphasized the important role the specification plays in the claim construction process.

The prosecution history also continues to play an important role in claim interpretation. Like the specification, the prosecution history helps to demonstrate how the inventor and the Patent and Trademark Office ("PTO") understood the patent. *Id.* at 1317. Because the file history, however, "represents an ongoing negotiation between the PTO and the applicant," it may lack the clarity of the specification and thus be less useful in claim construction proceedings. *Id*. Nevertheless, the prosecution history is intrinsic evidence that is relevant to the determination of how the inventor understood the invention and whether the inventor limited the invention during prosecution by narrowing the scope of the claims. *Id.*

*Phillips* rejected any claim construction approach that sacrificed the intrinsic record in favor of extrinsic evidence, such as dictionary definitions or expert testimony. The *en banc* court condemned the suggestion made by *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), that a court should discern the ordinary meaning of the claim terms (through dictionaries or otherwise) before resorting to the specification for certain limited purposes. *Phillips*, 415 F.3d at 1319-24. The approach suggested by *Texas Digital*—the assignment of a limited role to the specification—was rejected as inconsistent with decisions holding the specification to be the best guide to the meaning of a disputed term. *Id*. at 1320-21. According to *Phillips*, reliance on dictionary definitions at the expense of the specification had the effect of

"focus[ing] the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent." *Id*. at 1321. *Phillips* emphasized that the patent system is based on the proposition that the claims cover only the invented subject matter. *Id.* What is described in the claims flows from the statutory requirement imposed on the patentee to describe and particularly claim what he or she has invented. *Id*. The definitions found in dictionaries, however, often flow from the editors' objective of assembling all of the possible definitions for a word. *Id*. at 1321-22.

*Phillips* does not preclude all uses of dictionaries in claim construction proceedings. Instead, the court assigned dictionaries a role subordinate to the intrinsic record. In doing so, the court emphasized that claim construction issues are not resolved by any magic formula. The court did not impose any particular sequence of steps for a court to follow when it considers disputed claim language. *Id*. at 1323-25. Rather, *Phillips* held that a court must attach the appropriate weight to the intrinsic sources offered in support of a proposed claim construction, bearing in mind the general rule that the claims measure the scope of the patent grant.

## III. CONSTRUCTION OF AGREED TERMS

The parties have agreed to the construction of the terms listed below.[2] Dkt. 188 at 2-3.

| Claim Term | Agreed Definition |
| --- | --- |
| scarcity | No construction necessary |
| authenticity | genuineness |
| electronic trading card (ETC) | an electronic card that is configured to be collected and traded |
| said ETC randomly distributed in partial sets | said ETC distributed in partial sets with no definite pattern of distribution |

---

[2] "Scarcity" and "authenticity" were agreed upon prior to the briefing. The "ETC," "said ETC randomly…," and "runtime engine" terms were agreed to by all parties post-briefing. At the oral hearing, Plaintiff and Konami announced agreement to the "disassociating…" and "each ETC…" terms.

| Claim Term | Agreed Definition |
|---|---|
| a runtime engine | software that includes media handlers and display routines, a timing mechanism, display management software, and input handlers |
| [] disassociating a computer program consisting of a plurality of electronic trading cards (ETCs) | separating a computer program so that it is not part of a larger computer program, and only includes two or more electronic trading cards |
| each ETC… having an electronic format that supports card scarcity and card authenticity | each ETC having a data format made up of a number of components one or more of which enables scarcity and authenticity |

In view of the parties' agreements on the proper construction of each of the identified terms, the Court adopts the parties' agreed-upon constructions as set forth above. These agreed-upon constructions govern in this case as to these particular terms.

## IV. CONSTRUCTION OF DISPUTED TERMS

### A. Disassociated Terms[3]

| Claim Phrase (Claim No.) | Plaintiff's Proposed Construction | Konami's Proposed Construction |
|---|---|---|
| a disassociated computer program consisting of a plurality of electronic trading cards (Claim 1) | a computer program that is not part of a larger computer program and that only includes two or more electronic trading cards | a separate computer program that is not part of a larger computer program, and only includes two or more electronic trading cards |

The parties' disagreement focuses on whether the computer program must be a "separate" program.

**1. The Parties' Positions**

Plaintiff asserts that the specification teaches what is meant by "disassociated":

---

[3] The parties proposed and briefed competing constructions for a similar disassociating term in claim 21. Konami announced agreement to Plaintiff's construction at the oral hearing. In addition, at the oral hearing Konami announced agreement to Plaintiff's use of "larger" in place of "another" as previously asserted by Defendants.

> Although these trends may seem loosely related, they converge in a potential product opportunity to create systems for disassociated consumer multimedia, i.e. multimedia products that allow consumers to browse, create, collect, and exchange disassociated pieces for multimedia data. Almost all multimedia software is published today as large, monolithic collections of data that can only be browsed by the consumer – much like the analog publishing model of books and movies.
> The trends mentioned above create the potential for electronically literate consumers to take advantage of data compression and affordable high-density storage to create, collect, and exchange disassociated pieces of multimedia information using their multimedia personal computers and video game systems. Collecting and exchanging can occur on physical media such as high density floppy discs or on-line systems.

2:9-25.

Plaintiff states that "separate" is superfluous and inconsistent with the PTO Board of Appeals March 13, 2000 Decision on Appeal: "We interpret 'a disassociated computer program' in claim 1 to be a separate computer program, i.e., a program that is not part of a larger computer program." Dkt. 187 at 4, Ex. M at 5 (PTO Board of Appeals March 13, 2000 Decision on Appeal). Plaintiff asserts that the Board provided two definitions, "a separate computer" and also more specifically one that is "not part of a larger computer program." Plaintiff asserts that the latter is more helpful to the jury and thus Plaintiff chose that construction. Dkt. 187 at 4. Plaintiff states that Defendants misunderstand the claims in question. In particular, Plaintiff asserts that Defendants' position is that not including "separate" would allow trading cards that are not separate, but rather bound together, to be considered "disassociated." Plaintiff asserts that there is absolutely no requirement in the claims that ETC be in any way "disassociated." Dkt. 187 at 4. Plaintiff asserts that the claim requires the "computer program" to be "disassociated" and any "computer code segment" to which an ETC corresponds to be "disassociated." Plaintiff asserts that the claim does not require that an ETC is "disassociated." Plaintiff asserts that it may be a matter of technological necessity that ETCs end up disassociated

by virtue of the "computer code segment" limitation. However, Plaintiff asserts that such a question is a fact issue that remains to be seen and is irrelevant as the claim does not impose the limitation upon "ETC."

In the briefing, Plaintiff states that "[t]aken as a whole, therefore, these claim phrases of claims 1 and 21 refer, respectively, to a 'separate computer program that is not part of a larger computer program and that includes only two or more electronic trading cards' or 'generating a separate computer program that is not part of a larger computer program and that includes only two or more electronic trading cards.'" Dkt. 165 at 13-14. At the oral hearing Plaintiff acknowledged that it accurately characterized "disassociating" to include the concept of being separate from a larger program.[4] Plaintiff stated that its primary concern was that the specification taught that an ETC may include sub-programs and that inclusion of "separate" may cause jury confusion in which a jury may think that sub-programs cannot be included in a program that is "separate." At the hearing, Plaintiff stated that it would not object to a construction including "separate" as long as it was clear that the use of sub-programs does not prevent a program from being encompassed within the construction.

Defendants assert that the patent uses the term "disassociated" to distinguish between things like the pages of a book (which are bound together and cannot be exchanged separately) and things like trading cards which can be collected and exchanged individually. Dkt. 183 at 5 (citing 2:9-23). Defendants quote the Board of Patent Appeals as finding that "[t]he term disassociated was used in the specification in the sense of 'separate,' 'standing by itself,' or 'not part of something else' which is consistent with its normal meaning of 'detached from association." Dkt. 183 at 6, Ex. A-4 at 4 (PTO Board of Appeals March 13, 2000 Decision on

---

[4] The parties' agreed constructions also included using "separating" with regard to the use of "disassociating" in method claim 21.

Appeal). Defendants assert that Plaintiff's construction is an incomplete adoption of the meaning of "disassociated" that was adopted by the Board. At the hearing, Konami emphasized that when a separate program is loaded into a game, the separate program may still interact with other parts of the game. However, Konami asserted that a fundamental concept of the invention was that an electronic trading card may be separated from the game program such the one can disassociate the computer program consisting of the electronic trading cards from the game program.

    2. Analysis

The dispute remaining between the parties does not involve the underlying meaning of the term but rather what would be more understandable and cause less jury confusion. Thus, Plaintiff acknowledges that the computer program is "separate" and Konami acknowledged that its construction inherently includes the "larger" concept. The Patent Office Board of Appeals included both terms. The inclusion of both terms helps resolve the parties' potential concerns of jury confusion. The inclusion of "separate" aids in the understanding of what it means to be "not part of a larger computer program." As to Plaintiff's concerns over the implications of "separate" with regard to sub-programs, the Court does not perceive any likely confusion. Further, the specification is clear that the data format of an electronic trading card may include multiple sub-programs. Figure 1, 3:58-4:10, 5:1-32. Thus, it would be improper to argue that merely including sub-programs within the program prevents the program from being "separate." **The Court construes "disassociated computer program consisting of a plurality of electronic trading cards" to mean "a separate computer program that is not part of a larger computer program and that only includes two or more electronic trading cards."**

## B. "each ETC corresponding to a disassociated computer code segment "[5]

| Claim Phrase (Claim No.) | Plaintiff's Proposed Construction | Konamis Proposed Construction |
|---|---|---|
| each ETC corresponding to a disassociated computer code segment<br><br>(Claims 1 and 21) | each ETC being at least one computer code segment that is not part of a larger code segment | each ETC is a computer code segment that is separate and not part of larger ETC |

The parties' dispute centers upon what is meant by "corresponding to."

**1. The Parties' Positions**

Plaintiff asserts that the construction of the term need only capture the concept that each ETC corresponds to and can be matched up with its own segment of computer code. Dkt. 165 at 17. Plaintiff asserts that this conforms to the PTO Board of Appeals which construed "disassociated computer code segment" to mean "code segment that is not part of a larger code segment." Dkt. 165 at 18 (citing Ex. M at 5, PTO Board of Appeals March 13, 2000 Decision on Appeal).

In response, Defendants assert the claim instructs that a computer program consists of ETCs and then continues to describe what an ETC is – "each ETC corresponding to a disassociated computer code segment." Defendants assert the meaning of "disassociated" is discussed above and that the remaining issue is the meaning of "corresponding to." Defendants assert that Plaintiff's construction allows each ETC to correspond to more than one code segment. Defendants assert that the intrinsic record is clear that each ETC must be a separate ("disassociated") computer code segment. Dkt. 183 at 9. At the oral hearing, Konami acknowledged that its use of "is" in Defendants construction implies "is one and only one segment."

---

[5] At the oral hearing Konami announced it had agreed to use "larger" in this term.

Defendants assert that the Board of Patent Appeals found that "corresponds to" means "is" as the Board stated:

> [t]he "ETC corresponding to a disassociated computer code segment" in all of the independent claims is interpreted to mean that the ETC is a separate computer code segment, i.e., a code segment that is not part of a larger code segment.

Dkt. 183 at 9 (quoting Ex. A-4 at 5, PTO Board of Appeals March 13, 2000 Decision on Appeal). Defendants further assert that the specification repeatedly describes ETCs as disassociated code segments: "complete game, or game in progress, is distributed as disassociated code segments in the form of a series of ETCs" (12:37-39) and "ETC games are distinct from existing computer or video games in that the game architecture includes disassociated components in the forms of ETCs" (10:62-64). Defendants assert that if ETCs are "distributed as disassociated code segments" then the ETCs are not just "matched to" or "connected with" the code segments, they are the code segments. Defendants assert this conforms to the ordinary meaning of "corresponding." Dkt. 183 at 10. Defendants assert that Plaintiff's position that multiple cards can be matched to or connected with the same computer code segment subverts the claim requirement that each ETC corresponds to a separate, "disassociated" computer code segment. Dkt. 183 at 10.

On reply, Plaintiff asserts that the Board's construction does not mean that a single contiguous code segment must be used. Plaintiff asserts that Defendants' construction reads out of the claim "corresponds." Plaintiff also asserts that Defendants' construction limits the term "a" to only one, even though Federal Circuit law holds that "a" typically means "one or more." Dkt. 187 at 8. Plaintiff also asserts that a construction that interprets the limitation to mean the ETC card is the same as the code as opposed to just corresponding to the code was not necessary to the Board's rejection.

Plaintiff further asserts that Defendants' construction is contrary to the specification. Plaintiff cites to the passage at 10:39-41 in which an ETC making engine "compiles the associated files into an ETC." Plaintiff asserts that such complexity would rarely be contained within a single contiguous computer code segment. Plaintiff asserts that the specification never teaches that the ETC format is contained in a single contiguous code segment. Plaintiff asserts that the Defendants' construction requires the ETC to be one disassociated computer code segment. Plaintiff asserts the claims do not require this and the complexity of the ETCs taught in the specification contradict this. Dkt. 187 at 9-10.

### 2. Analysis

The meaning of "disassociated" carries the same connotations as described above with regard to the disassociated computer program term and the Court does not find support in the intrinsic record to provide a different meaning to the "disassociated" with regard use to the use in the code segment term. The main dispute revolves around the meaning of "corresponds to" and the meaning of "a" segment. The Defendants seek to equate an ETC to one and only one code segment. Plaintiff's concerns that such a requirement could be interpreted to require only one single contiguous segment are valid. The specification provides guidance as to what forms an ETC. At 3:58-4:10 and 5:8-32 the ETC is described as having numerous components. Many of these components are items that one would assume may be common between multiple ETCs and items that would not necessarily be limited to only a single code segment: "ETC Graphic Identification, such as audio visual logo, copyright notice, company information," "animation, video, pictures, sounds, text," "Utility Programs, such as copy protection, printing, telecommunications protocols, self destruction (erasing) routines," "Applications, including incomplete linkable code segments, games, puzzles, and utilities," and a "User Writable Area for personalization, ASCII messages, voice recording, score keeping." In addition, the ETC may

even point to external data and programs: "[p]ointers to external data and programs embedded in scripts which trigger the display of external media or run external applications." In context of the specification it is clear that an ETC is not limited to a single code segment. In the framework of the intrinsic record as a whole, particularly in light of the specification description of an ETC, "corresponds to" does not mean "is only" but rather that each ETC has a disassociated computer code segment such that there is correspondence between an ETC and a disassociated computer code segment. **The Court construes "each ETC corresponding to a disassociated computer code segment" to mean "each ETC being at least one separate computer code segment that is not part of a larger code segment."**

## V.   CONCLUSION

The Court adopts the constructions set forth in this opinion for the disputed terms of the patents-in-suit. The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

Within thirty (30) days of the issuance of this Memorandum Opinion and Order, the parties are hereby ORDERED, in good faith, to mediate this case with the mediator agreed upon by the parties. As a part of such mediation, each party shall appear by counsel and by at least one corporate officer possessing sufficient authority and control to unilaterally make binding decisions for the corporation adequate to address any good faith offer or counteroffer of settlement that might arise during such mediation. Failure to do so shall be deemed by the Court

as a failure to mediate in good faith and may subject that party to such sanctions as the Court deems appropriate.

**So ORDERED and SIGNED this 4th day of January, 2013.**

_____
RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE